**Opinion issued July 12, 2012**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00346-CR

———————————

**HAIM SILBER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 232nd District Court**
**Harris County, Texas**
**Trial Court Case No. 0977241**

---

## O P I N I O N

A jury previously convicted appellant, Haim Silber, of the second degree

felony offense of indecency with a child.[1]   The jury assessed punishment at a

---

[1]   *See* TEX. PENAL CODE ANN. § 21.11(a)(1) (Vernon 2011).

$10,000 fine and nine years' confinement, and it recommended that the sentence be probated. Upon the recommendation of the jury, the trial court placed appellant on community supervision for five years. The State subsequently filed a motion to revoke appellant's community supervision. The trial court granted the motion, revoked appellant's community supervision, and assessed punishment at five years' confinement. In one issue, appellant contends that the State failed to present sufficient evidence that he violated conditions of community supervision by (1) committing an offense against the laws of Texas by changing his residence without complying with the sex offender registration requirements and (2) failing to attend a sex-offender treatment session.

We reverse the revocation order and reinstate appellant's community supervision.

**Background**

In 2005, appellant was convicted of indecency with a child, and, on the jury's recommendation, the trial court placed him on community supervision for five years. As a condition of his community supervision, appellant was required to register as a sex offender and comply with all sex offender registration requirements contained in Code of Criminal Procedure Chapter 62, including the requirement that, if he changed addresses, he inform the applicable registration authority of his new address and provide proof of residence. *See* TEX. CODE CRIM.

2

PROC. ANN. art. 62.055(a) (Vernon Supp. 2011). The terms and conditions of appellant's community supervision also required him to refrain from committing any new offenses against the laws of Texas and to participate in a sex offender treatment program. Pursuant to these conditions, appellant registered as a sex offender and provided his address to the registration authorities ("the registered address").

On February 3, 2011, the State moved to revoke appellant's community supervision. The State alleged that appellant committed the following violations of the terms and conditions of his community supervision:

> Committing an offense against the laws of Texas, to wit: on or about December 7, 2010, the Defendant did then and there unlawfully while a person with a reportable CONVICTION for the offense of INDECENCY WITH A CHILD, and while subject to registration under the Texas Sex Offender Registration Program, change his residential address and intentionally and knowingly fail to timely report in person to the local law enforcement agency in the municipality or county in which the Defendant's new address was located in order to provide proof of identity and proof of residence, by failing to report and provide said information in person to said authority within seven days after the change of address or upon the first date the authority would, by policy, allow the Defendant to report.
>
> . . . .
>
> Failing to comply with sex offender registration, to wit; the Defendant was ordered to comply with sex offender registration procedures as required by the laws of this or any other State in which he resides beginning 10/3/06, and at anytime thereafter as directed by his Community Supervision Officer. The Defendant failed to comply with sex offender registration procedures by moving without notifying the registering agency as required by law.

3

. . . .

Failing to attend sex offender treatment as scheduled on January 27, 2011.

Appellant pleaded not true to the allegations in the State's motion to revoke.

At the revocation hearing, Houston Police Department ("HPD") Sergeant T. Wood, who is also a member of an HPD/FBI task force, testified that he was approached by an FBI agent who requested Wood's assistance in locating appellant to conduct an interview concerning an unrelated investigation. The FBI agent informed Sergeant Wood that he attempted to interview appellant at his registered address on December 7, 2010, but no one was present. The agent learned that appellant rented a mailbox at a local UPS Store, and UPS records indicated that appellant listed his parents' address, not his registered address, as his home address. The agent drove by appellant's parents' house and saw a vehicle registered to appellant parked in front of the house.

Around 7:30 a.m. on December 13, 2010, Sergeant Wood and his partner drove to appellant's parents' house and saw his vehicle parked in front of the house. The officers then drove directly to appellant's registered address, knocked on the door, and received no answer. Sergeant Wood testified that there was a vehicle parked in the driveway of the registered address that appeared to be broken down. Appellant's next-door neighbor informed Sergeant Wood that appellant had previously given him permission to park the vehicle in appellant's driveway.

4

Sergeant Wood testified that he spoke with several of appellant's neighbors who lived across the street. These neighbors opined that "[n]o one currently lives at that address" and told Sergeant Wood that they had seen appellant stop by the house, pick up the mail, and then leave. The neighbors correctly identified appellant's vehicle.

Sergeant Wood testified that, during the course of his investigation, he went by the registered address three or four times from 6:30 to 8:30 in the morning, three or four times from noon to 2:00 p.m., and three or four times during the evening, as late as 6:00 p.m. Sergeant Wood never saw appellant or his vehicle at the registered address, and no one ever answered when he knocked. Sergeant Wood also checked appellant's parents' house three or four times in the morning, and each time, appellant's vehicle was present at the house. He never attempted to speak with appellant at his parents' house, and he never spoke with appellant's parents.

HPD officers arrested appellant on January 27, 2011. Sergeant Wood spoke with appellant after his arrest, and he testified that appellant told him that he did not have electricity at his registered address because he could not afford it, but he did have water service because his landlord required it.

Miguel Acosta, who lives across the street from appellant's registered address, testified that, although he did not often see appellant at his house, when he

5

did, he would usually see appellant between 8:00 p.m. and 10:00 p.m., and appellant would arrive and "would look in the mail box for the mail just for a while and then he would leave." Acosta never saw any lights on at the house. He also testified that he usually left for work around 3:00 or 4:00 a.m., and on a few occasions, he would see appellant's vehicle parked outside his house. On cross-examination, Acosta acknowledged that he told his wife that he "used to see [appellant] coming home at night and leaving early in the morning."

Sandra Acosta, Miguel's wife, testified that she never noticed appellant at home during daylight hours, but she would see appellant arrive at the registered address around 8:00 or 9:00 p.m. She did not know how long appellant would stay at the house, but she would sometimes see appellant's vehicle parked outside his house when she awoke to fix Miguel's lunch around 3:45 a.m. She estimated that appellant spent the night at the registered address around three nights per week. She stated that appellant did not spend every night there. On cross-examination, Sandra acknowledged that she had seen appellant leaving the registered address around 4:00 a.m.

Luis Bonilla, who lives directly across the street from appellant, testified that he had infrequently seen appellant around the neighborhood. He stated that he had seen appellant a "[l]ittle more often in the past couple of weeks" before the revocation hearing, at least three times per week. He testified that his wife spoke

6

to a police officer in December 2010, and, before that time, he saw appellant at the registered address "[m]aybe once every two weeks, no more than three times a month maybe." Bonilla testified that, when he saw appellant, it was either from 5:00 p.m. to 7:00 p.m. in the evening or from 8:00 p.m. to midnight. Bonilla would also occasionally see appellant either "leaving the house or coming to the house" when he left for work at 6:00 a.m. He testified that appellant would usually stop at the house, get his mail, and leave, but he stated that appellant would sometimes stay overnight or for "just a couple [of] hours." In the weeks leading up to the revocation hearing, appellant would arrive after 9:00 p.m. and would leave in the morning.

John Gallo, another neighbor, agreed with Bonilla that he saw appellant's vehicle at the registered address "a lot more often" since the State moved to revoke appellant's community supervision. He testified that he had seen appellant walking to his vehicle a "couple [of] times" and only after 9:00 p.m. Before an officer spoke with him about this case, Gallo had only seen appellant "[m]aybe a couple [of] times in like six months." Gallo testified that he usually left his house around 6:00 or 7:00 a.m., and he never saw appellant's vehicle in front of the registered address.

Allen Sumair, appellant's landlord, testified that appellant had been leasing the registered address for over two years. Before appellant moved in, no utilities

7

were hooked up, but appellant had hooked up both water and gas service. Sumair testified that this house had never had electricity service during the time that appellant has lived there. He also testified that he drives by the property once a month, and, because the yard and house look well-maintained, he does not stop and go inside. He has never seen appellant present when he drives by.

Appellant called Rabbi Betzalel Marinovsky, who testified that appellant is a student of his. He testified that he is familiar with appellant's usual daily schedule, which includes attending a ritual bath and morning prayers at the synagogue around 6:00 a.m. Appellant goes to Rabbi Marinovsky's house in the evenings, after work, for dinner or classes approximately three times per month. On those occasions, he usually leaves around 10:00 p.m.

On cross-examination, Rabbi Marinovsky confirmed that he has been to the registered address "a few times." He testified that appellant does not have electricity at his house. On re-direct, Rabbi Marinovsky testified that he is familiar with appellant's financial situation. He stated that appellant earns "very little" and that he is trying to live a "very economical" life and "as frugal[ly] as possible."

David Morekhay testified that he hired appellant on Rabbi Marinovksy's recommendation to help with appellant's financial situation. Morekhay stated that appellant primarily helps with Morekhay's family business in Israel. He testified that he will often work on documents during the day and will then give those

documents to appellant to fax, and, because of the eight-hour time difference between Houston and Israel, appellant has to wait until after 11:00 p.m. Houston time in order to fax the documents and receive confirmation that the fax was successfully transmitted. Morekhay testified that his business does not have a fax machine but appellant's parents do, and appellant would send faxes from his parents' house a "couple [of] times a week at least."

On cross-examination, Morekhay testified that he has been to appellant's house and that it does not have electricity because appellant "can't afford it." He stated that appellant did have some furniture and belongings there and that he sleeps there. He also testified that appellant goes to the ritual bath at the synagogue every morning around 6:00 a.m.

Nora Sosa, appellant's next door neighbor, testified that, when she needs to speak with appellant, she goes to his house around 11:30 p.m. or 6:00 a.m., when she knows that he is there. She stated that her husband and appellant have an arrangement whereby her husband cuts appellant's grass and appellant allows the Sosas to park their car in his driveway instead of on the street. On cross-examination, she testified that she believes appellant is at the registered address every night and that she often sees his vehicle parked at the house.

Dr. Nicholas Edd, a psychologist and licensed sex offender treatment provider, testified that appellant was referred to him for treatment in March 2007.

9

Dr. Edd stated that he meets with appellant once weekly and that appellant has missed appointments in the past, but he has always notified Edd in advance to schedule a make-up session. He testified that, in his opinion, appellant is making "minimal progress" in his treatment because he is "not taking full responsibility for the nature of the offense." On cross-examination, Dr. Edd acknowledged that appellant was also seeing a psychiatrist and was participating in "ongoing treatment."

At the close of the hearing, the trial court stated, on the record, that it found that appellant "violated conditions of [his] probation." The written judgment states:

> The Court FINDS Defendant has violated the conditions of community supervision as set out in the State's ORIGINAL Motion to Revoke Community Supervision as follows: ON OR ABOUT 12-07-2010 HE COMMITTED THE OFFENSE OF FAILURE TO COMPLY WITH SEXUAL REGISTRATION REQUIREMENTS. HE ALSO FAILED TO ATTEND SEX OFFENDER TREATMENT.

The trial court revoked appellant's community supervision and assessed punishment at five years' confinement.

## Revocation of Community Supervision

In his sole issue, appellant contends that the State failed to present sufficient evidence that he violated the terms of his community supervision by changing his

10

address without notifying the sex offender registration office and by failing to attend a sex-offender treatment session.[2]

## A.    Standard of Review

At a hearing to revoke a defendant's community supervision, the State must prove by a preponderance of the evidence that the defendant has violated a condition of his community supervision. *Rickels v. State*, 202 S.W.3d 759, 763–64 (Tex. Crim. App. 2006) (quoting *Scamardo v. State*, 517 S.W.2d 293, 298 (Tex. Crim. App. 1974)); *Canseco v. State*, 199 S.W.3d 437, 438 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). "[A]n order revoking probation must be supported by a preponderance of the evidence; in other words, that greater weight of the credible evidence which would create a reasonable belief that the defendant has violated a condition of his probation." *Rickels*, 202 S.W.3d at 763–64 (quoting *Scamardo*, 517 S.W.2d at 298). Our review of an order revoking community supervision is limited to determining whether the trial court abused its discretion in ruling that the defendant violated the terms of his community supervision. *Rickels*, 202 S.W.3d at 763 (quoting *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984));

---

[2]    Although the State, in its motion to revoke, alleged three distinct violations of the terms of appellant's community supervision, it alleged that appellant committed a new offense against the laws of the State of Texas by failing to comply with the applicable sex-offender registration requirements—namely, by failing to notify authorities of his change in address—and, as a separate violation, that appellant violated the sex-offender registration requirements by failing to report his address change. We treat these allegations as one ground supporting revocation of appellant's community supervision.

11

*Duncan v. State*, 321 S.W.3d 53, 56–57 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).  We examine the evidence in the light most favorable to the trial court's order.  *Duncan*, 321 S.W.3d at 57; *Canseco*, 199 S.W.3d at 439.

A finding of a single violation of the terms of community supervision is sufficient to support revocation.  *Joseph v. State*, 3 S.W.3d 627, 640 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *see also Moore v. State*, 605 S.W.2d 924, 926 (Tex. Crim. App. 1980) ("We need not address appellant's other contentions since one sufficient ground for revocation will support the court's order to revoke probation.").  Thus, in order to prevail on appeal, the defendant must successfully challenge all of the findings that support the revocation order.  *Joseph*, 3 S.W.3d at 640 (citing *Jones v. State*, 571 S.W.2d 191, 193–94 (Tex. Crim. App. 1978)); *see also Baxter v. State*, 936 S.W.2d 469, 472 (Tex. App.—Fort Worth 1996, pet. dism'd) (holding that because appellant did not challenge second ground for revocation, sufficient evidence supported revocation).

### B.     *Failure to Update Sex Offender Registration Information*

A person commits the offense of failure to comply with sex offender registration requirements if he "is required to register and fails to comply with any requirement of" Chapter 62 of the Code of Criminal Procedure.  TEX. CODE CRIM. PROC. ANN. art. 62.102(a) (Vernon 2006); *Young v. State*, 341 S.W.3d 417, 425 (Tex. Crim. App. 2011) ("Article 62.102 is a generalized 'umbrella' statute that

criminalizes the failure to comply with any of the registration requirements set out in Chapter 62."). Article 62.051(a) requires a person with a "reportable conviction" to register with "the local law enforcement authority in any municipality where the person resides or intends to reside for more than seven days." TEX. CODE CRIM. PROC. ANN. art. 62.051(a) (Vernon Supp. 2011).

If a person who is required to register as a sex offender intends to change the address of his residence, he "shall, not later than the seventh day before the intended change, report in person to the local law enforcement authority designated as the person's primary registration authority by the department and to the . . . community supervision and corrections department officer . . . supervising the person and provide the authority and the officer with the person's anticipated move date and new address." *Id.* art. 62.055(a); *Green v. State*, 350 S.W.3d 617, 621 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *Villanueva v. State*, 257 S.W.3d 527, 529 (Tex. App.—Austin 2008, no pet.). The Code of Criminal Procedure also provides,

> If a person required to register changes address, the person shall, not later than . . . the seventh day after changing the address . . . report in person to the local law enforcement authority in the municipality or county in which the person's new residence is located and provide the authority with proof of identity and proof of residence.

TEX. CODE CRIM. PROC. ANN. art. 62.055(a); *Young*, 341 S.W.3d at 420 ("[A]ll registered sex offenders are required to give notice in person to local law

13

enforcement when they intend to change their address and again after they have done so."). In this situation, the "forbidden act" is "failing to inform law enforcement about an impending or completed change of residence." *Young*, 341 S.W.3d at 426.

Code of Criminal Procedure Chapter 62 does not provide a definition for what constitutes a "residence."[3] In the context of a defendant's alleged failure to inform his probation officer of a change in residence, as required by the terms and conditions of his probation, the Court of Criminal Appeals has held that

> [r]esidence is an elastic term. The meaning that must be given to it depends upon the circumstances surrounding the person involved and largely depends upon the present intention of the individual. Neither bodily presence alone nor intention alone will suffice to create the residence, but when the two coincide, at that moment the residence is fixed and determined.

*Whitney v. State*, 472 S.W.2d 524, 525 (Tex. Crim. App. 1971); *see also Whitehead v. State*, 556 S.W.2d 802, 805–06 (Tex. Crim. App. 1977) (citing *Whitney* with approval and holding that State failed to present sufficient evidence that probationer changed his residence when probationer stayed at another location

---

[3] Instead, Chapter 62 solely defines "residence" as follows: "'Residence' includes a residence established in this state by a person described by Article 62.152(e)." TEX. CODE CRIM. PROC. ANN. art. 62.001(7) (Vernon Supp. 2011). Article 62.152(e) describes certain workers or students who reside in another state, are "employed, carr[y] on a vocation, or [are] student[s] in this state," and who establish a second residence in this state to work or attend school. *Id.* art. 62.152(e) (Vernon 2006). This statute is not applicable here.

for less than two weeks, but left property at registered address and testified that he considered his registered address to be his permanent address).

Here, in its motion to revoke appellant's community supervision, the State alleged that appellant committed a new offense against the laws of Texas by failing to comply with the sex offender registration requirement mandating that, if he changes his address, he report his new address and provide proof of residence to the proper authorities within seven days after the address change. The State contended that appellant changed his residence from his registered address to his parents' house. As supporting evidence, the State pointed out that officers had checked appellant's registered address at different times of the day on several different days and never found him at that address; that appellant's neighbors testified that they rarely saw him and, when they did, he would check his mail, stay for a short period of time, and then leave; that his neighbors never saw any lights on at his registered address; that appellant only spent a few nights per week at the registered address; that, after the State moved to revoke, appellant began spending more time at the registered address; that officers saw appellant's vehicle parked at his parents' address on several occasions; and that appellant had rented a box at a UPS Store and listed his parents' address as his home address.

Sergeant Wood testified that he visited appellant's parents' house "three or four times in the morning" and found appellant's vehicle parked outside, but the

15

State presented no evidence that appellant does anything more than frequently visit his parents' house. Sandra Acosta estimated that appellant only spent three nights per week at the registered address, but the State presented no evidence that appellant ever spent the night at his parents' house or that he moved any of his belongings to his parents' house. Although he listed his parents' address as his home address for the purposes of obtaining a mailbox at a UPS Store, the State presented no evidence concerning when appellant obtained that box or whether he currently utilized that box at the time of the relevant events.

The State's evidence that appellant was not present at the registered address during the day, that he was not often seen by his neighbors at the registered address, that he did not have electricity at the registered address, and that he did not spend every night at the registered address does not constitute evidence that appellant was not still living and residing at the registered address. The testimony, for example, also reflected that appellant spent at least a few nights per week at the registered address and that he still received mail at the registered address. Appellant presented evidence that, due to his financial situation, he could not afford electricity, but he could afford water and gas service at the registered address, as required by his landlord. Appellant successfully made his monthly rental payments, and his landlord testified that he drove by the property once a month, and, because the house and the yard looked well-maintained, he did not

16

stop to inquire about appellant's use of the property. Appellant's witnesses also testified concerning his unusual hours: appellant attended the ritual baths and morning prayers at his synagogue every morning around 6:00 a.m., and, due to the need to occasionally send faxes to Israel for work, he had to use the fax machine at his parents' house late at night.[4] Appellant also presented evidence that he maintains furniture and belongings at the registered address.

A registered sex offender is not required to spend every spare moment and every night at their registered address. *See Whitehead*, 556 S.W.2d at 805–06; *Whitney*, 472 S.W.2d at 525. We conclude that, based on the particular facts and circumstances of this case, the State failed to prove that appellant changed his residence from his registered address to his parents' house. *See Whitehead*, 556 S.W.2d at 805–06. We hold that the trial court erroneously found that appellant committed a new offense against the laws of Texas by failing to comply with Code of Criminal Procedure article 62.055(a)'s requirement that he inform the appropriate authorities of his change in residence in accordance with the particular conditions of that statute.

### C. Failure to Attend Sex Offender Treatment

The terms and conditions of appellant's community supervision required him to attend a sex-offender treatment program. Since March 2007, appellant had

---

[4] There is no evidence that, on these occasions, appellant would then spend the night at his parents' house instead of returning to the registered address.

17

met with Dr. Edd once a week for such treatment. In its motion to revoke, the State alleged that appellant "fail[ed] to attend sex offender treatment as scheduled on January 27, 2011." Appellant contends that the State presented no evidence that he failed to attend treatment on this date and that, even if he did so fail, his failure was due to HPD officers arresting him for failure to comply with the sex-offender registration requirements. We agree with appellant.

Dr. Edd testified that he is a licensed sex-offender treatment provider and that he had been treating appellant since March 2007. He testified that he meets with appellant once a week, and, although appellant occasionally misses appointments, he has always notified Dr. Edd ahead of time and scheduled a make-up session. The prosecutor and Dr. Edd then discussed whether, in Dr. Edd's opinion, appellant was making progress in his treatment. The State did not ask Dr. Edd whether appellant had an appointment scheduled for January 27, 2011, the time of this appointment, or whether appellant failed to attend that appointment. Moreover, in response to a question from the trial court, Sergeant Wood testified that he arrested appellant on January 27, 2011. There was no testimony concerning what time of day the arrest occurred.

We conclude that the State failed to prove that appellant did not attend his required sex offender treatment appointment on January 27, 2011. We therefore hold that, because the State failed to present sufficient evidence that appellant

violated the specific terms and conditions of his community supervision as enumerated in the motion to revoke, the trial court abused its discretion in revoking appellant's community supervision.

We sustain appellant's sole issue.

## Conclusion

We reverse the revocation order of the trial court and reinstate appellant's community supervision.


Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Publish. TEX. R. APP. P. 47.2(b).