**Opinion filed December 19, 2024**



# In The

# Eleventh Court of Appeals

_____

## No. 11-22-00346-CR

_____

## SEBASTIAN ALEXANDER ZAPATA, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 238th District Court**
**Midland County, Texas**
**Trial Court Cause No. CR51328**

## M E M O R A N D U M   O P I N I O N

In 2019, a jury found Appellant, Sebastian Alexander Zapata, guilty of the second-degree felony offense of online solicitation of a minor under fourteen years of age and assessed his punishment at confinement for ten years in the Institutional Division of the Texas Department of Criminal Justice and a fine of $10,000.[1]  *See*

---

[1]Appellant unsuccessfully challenged the sufficiency of the evidence supporting his conviction in *Zapata v. State*, No. 07-19-00122-CR, 2020 WL 2610339 (Tex. App.—Amarillo May 21, 2020, pet. ref'd) (mem. op., not designated for publication).

TEX. PENAL CODE ANN. § 33.021(c), (f) (West Supp. 2024). However, following the jury's recommendation, the trial court suspended Appellant's sentence and placed him on community supervision for five years.

The State later filed a motion to revoke his community supervision. The trial court held a hearing on the motion wherein it found nine of the State's allegations to be true, revoked Appellant's community supervision, and assessed his punishment at confinement for three years in the Institutional Division of the Texas Department of Criminal Justice.

Appellant challenges the trial court's revocation of his community supervision in three issues. First, Appellant asserts that there was insufficient evidence to support that Appellant "intentionally failed to comply with the terms and conditions of his probation." Second, Appellant asserts that the trial court abused its discretion when it admitted the records from Appellant's GPS monitor over his hearsay objection. Finally, Appellant contends that the trial court abused its discretion by revoking Appellant's community supervision, rather than continuing or modifying it and failing to "fully consider" Appellant's mitigating evidence. We modify the district clerk's bill of costs, and as modified, we affirm.

*Background Facts*

Andrea Seabrook is a sex offender community supervision officer who managed the supervision of Appellant beginning in January 2021. At their first meeting, Appellant told Seabrook that he was not in agreement with certain conditions in the judgment, and she informed him that the only avenue to change his conditions would be to petition the trial court. However, Appellant did not file any motions to modify or challenge his probation conditions while Seabrook was assigned to his supervision. Seabrook testified that Appellant committed multiple violations of the conditions of his community supervision, which led to two administrative hearings before the State filed its motion to revoke. Seabrook

testified that the administrative hearings were held to encourage Appellant to comply with the conditions of his community supervision.

Seabrook testified that, before the first administrative hearing was held, Appellant (1) regularly missed his appointment time for monthly reporting, (2) missed the first appointment to have his GPS monitor installed, (3) committed multiple violations of his GPS monitoring condition, including allowing the battery to die, and (4) had problems remaining in compliance with the conditions of his sex offender treatment program.

In support of the GPS monitoring condition violations, the State offered the GPS records from Appellant's GPS monitor with an accompanying business record affidavit. Appellant's trial counsel objected on the basis of hearsay, not to the documents themselves, but "to the contents therein." The trial court overruled the objection and admitted the records.

In relation to his initial issues with the sex offender treatment program, Seabrook testified that Appellant failed to complete and mail his intake packet for seventy-nine days, which delayed his enrollment into program. Eventually, Seabrook made Appellant fill out the packet in her office, and she e-mailed the completed form to the treatment provider on Appellant's behalf. She testified that, once enrolled in the program, Appellant began to have issues with group therapy. Seabrook said that Douglas Brown, Appellant's sex offender treatment counselor, would send weekly progress notes informing her that Appellant exhibited a "flippant attitude" and often acted distracted. Other members of the group also contacted Seabrook to tell her that Appellant was a disruption and they felt that he had broken confidentiality by having other people in the room during sessions.

The first administrative hearing was held on March 23, 2021 to address Appellant's violations prior to that date. At this hearing, Appellant agreed to be in compliance, and Seabrook believed they "were on the same page." However,

Seabrook said that Appellant quickly displayed that he was not willing to comply. She testified that Appellant continued to commit violations of his community supervision conditions including: (1) failing to submit to and pay for a scheduled drug test, (2) violating his 9:00 p.m. curfew, and (3) continuing to have problems within his sex offender treatment program.

The unit supervisor requested a second administrative hearing, which was held on June 16, 2021, after Seabrook and Brown reported Appellant's continued issues with compliance. Seabrook said that the unit supervisor could see that Appellant continuously failed to comply and was prepared to file a motion to revoke, but after the assurances Appellant made during the hearing, she extended him another opportunity to gain compliance. After the hearing, Appellant told Seabrook that his behavior during the sex offender treatment program sessions were "influenced" by other people, so to maintain the security of the group for all members, Appellant was ordered to attend all future group sessions in a private room at Seabrook's office.

At the end of June 2021, Appellant was called to submit to a polygraph examination as part of his sex offender treatment program. Seabrook testified that, rather than a polygraph, a forensic interview was conducted because Appellant "admitted to all of the things with his instant offense." Seabrook said that Brown later reported that Appellant had recanted his admissions and was "bragging in his sex offender treatment group that the polygraph technician could not polygraph him." After attempting to work through the denial with Appellant, Brown unsuccessfully discharged him from the program. Subsequently, on August 24, 2021, the State filed a motion to revoke Appellant's community supervision.

Brown is a licensed sex offender treatment counselor contracting with Midland County Adult Probation. Brown testified about the conduct that led to Appellant's unsuccessful discharge from the program.

4

In January 2021, Appellant was referred to Brown's treatment program as a condition of his community supervision. Brown said that Appellant displayed "an early pattern of . . . oppositional non-compliant behavior." After Brown sent Appellant the intake packet to enroll in the program, Appellant failed to complete and return it for more than eight weeks. Brown testified that once enrolled in the program, it was clear that Appellant was in "[m]ore than a denial" phase and believed he was "angry at the whole system." Brown stated that sex offenders in denial are the "most dangerous . . . because they don't believe they have a problem," and that "a sex offender who does not believe he is a sex offender is a higher risk."

Brown also testified about Appellant's behavior during the group sessions. Brown said that during the group therapy sessions on Zoom, Appellant "appeared uninterested, indifferent and distracted" while his peers were speaking, and on one occasion, another member alerted Brown that Appellant appeared to be watching television. Brown said that when he asked Appellant questions, Appellant often rolled his eyes and "huff[ed]," and on more than one occasion, Brown had to ask Appellant to stop lying in bed during the sessions.

Brown testified that "rule number one" of the sex offender treatment group was confidentiality, and members were required to attend the meetings in a private place. Brown testified that, after he was asked a direct question, Appellant would sometimes appear to wait for another person to tell him what to say. Other members of the group also raised concerns that there were people in the room with Appellant during the zoom sessions. To ensure the sessions remained confidential, Appellant was eventually ordered to attend the Zoom meetings in a private room at Seabrook's office.

Brown said that Appellant tried to "build an alliance" with a member that had a similar offense and also displayed issues with denial. Brown testified that Appellant also used Zoom titles including, "Two Imposters Among Us" and "Eat

Your Veggies Kids" during the group therapy sessions. Brown said that when he addressed the inappropriate use of the screen names, Appellant acted "[d]efiant, oppositional, [and] passive aggressive."

Members of the program are required to take and pass annual polygraph examinations. Brown testified that the results for Appellant's polygraph were "no charts due to admissions" based on statements Appellant made that the examiner believed were admissions of guilt. Brown explained that a reading of "no charts" means that Appellant was not connected to the polygraph machine. In that regard, Brown explained that "[t]he goal of the first polygraph is to address the involvement of the initial offense, which is the offense that resulted in the client coming to the program. And so the first step is, of course, the ownership of the offense and saying yes, this is what I did." Brown testified that Appellant's admission was convincing enough to the examiner that he counted the test as "not a pass or a fail but that there's no charts because he made the admission." Brown testified that the results were "encouraging" as to Appellant's progress in the program, but when they discussed them, Appellant recanted his admission and "bragged that the examiner wasn't able to get him." Brown stated that after months of his enrollment in the program, he saw no progress from Appellant.

On August 13, Appellant attended his final session of group therapy before his unsuccessful discharge. At the meeting, Brown asked Appellant "if he felt that he ha[d] made any progress whatsoever in accepting acceptance [sic] or ownership of his offense since he began the treatment back in March, and [Appellant] replied no." Brown then met with Appellant and Seabrook after the session and discharged Appellant from the program "for his lack of making any progress." Brown said that he attempted to work with Appellant for six months, and that he had "given many others less time" before discharging them from the program. After his discharge, Appellant was no longer eligible to be reinstated in the program. Brown testified

6

that he believed the treatment process would be the same whether the individual pleaded guilty to the initial offense or was found guilty after a trial.

With respect to the underlying conviction, Appellant testified that he believed he had done nothing wrong and that he was entrapped by Texas Department of Public Safety. Further, Appellant felt that he was wrongly convicted by the jury and that he was the victim.[2] In response to Brown's assessment, Appellant said that he felt "confus[ed]" because he believed he was "actually making progress" in the program. Appellant testified that his issues with the program began with the intake packet that he was required to submit. Appellant said the packet seemed "monumental" and "something that [he] couldn't really force [him]self to get through," but he said Brown was encouraging and made him feel more confident.

Appellant testified that he "felt like [he] had to be a liar" to successfully complete the program because he felt he had not committed a crime and "they were

---

[2]The Amarillo Court of Appeals described the facts of the underlying conviction in the following manner:

> Cody Allen, a special agent with the Texas Department of Public Safety who had been certified in internet crimes against children, posted an undercover ad to Craigslist that indicated that he was a thirteen-year-old girl. The ad was posted in a section entitled "Women Seeking Men." Allen's ad received a response from [A]ppellant. Another officer, Chris Davis, conversed with [A]ppellant. Davis told [A]ppellant that he was a thirteen-year-old girl named Crystal. Appellant told Crystal that he was twenty-two but that the age difference did not bother him. During the discussion, [A]ppellant offered to get a hotel room or to "chill" in his car. After Crystal asked what the couple would do in the hotel room, [A]ppellant stated that, "We would do it gentle but firm and passionate. And after that[,] we would shower together and do it again. And then do it again on the bed, and then shower again. Rinse and repeat." Appellant later stated that he "would love to teach sex with" Crystal. Crystal then told [A]ppellant to come to the parking lot of an Office Depot. Appellant arrived at the parking lot less than fifteen minutes later. After arriving at the rendezvous location, [A]ppellant was arrested. Appellant possessed the phone that he had used to text Crystal when he was arrested.

> After [A]ppellant was arrested, he was interviewed by Detective David Olivera. Appellant admitted that he was the person who had messaged Crystal. He admitted that his initial intention was to have sex with Crystal but he claimed to have changed his mind and went to meet with her because he wanted to save her from men on Craigslist.

*Zapata*, 2020 WL 2610339, at *1.

putting words inside of [his] head." Appellant also believed that the program "wasn't really a process for [him]" because he had not had physical contact with a minor. He testified that he understood that failure to admit the offense would be considered noncompliance and result in his dismissal from the program. Appellant did not recall the admissions he made during the polygraph or bragging that he had lied to the examiner. However, Appellant did recall that on one occasion, he told his therapy group that they should visit his mother's website dedicated to entrapment stings and online solicitation, but he testified that he had only a "general idea" of the content and never visited the website.

Appellant said that, during one of the administrative hearings, he made a request to the administrator of probation and Seabrook for a change in sex offender treatment counselors to help him "feel more successful." Appellant testified that he hired an attorney to assist with a change in treatment providers, but he said that "the process took too long" and he was "kicked out" of counseling before the modification could be made.

When asked whether he would be compliant with the conditions if placed on community supervision again, Appellant said, "I honestly don't see myself as being defiant. I see myself being more compliant than anything." Appellant explained that he felt people misunderstood his "viewpoint" and did not believe it translated to noncompliance. Appellant claimed that any perceived noncompliance was the result of "tr[ying] to find a balance of keeping up with probation and trying to maintain [a] healthy lifestyle for [his] mental state."

Appellant testified that he was more capable of following the conditions of his community supervision after the hearing on the motion to revoke because he understood more about how they would actually work. Although the expectations were explained to him at the beginning and throughout his community supervision, Appellant said that he was "not a very smart learner" and needed to see someone

else experiencing it before he could "fully understand what it is [he's] capable of doing."

As a condition of his community supervision, Appellant was assessed $5,850 in attorney's fees, $2,846.50 in court costs, a $50 Crime Stoppers fee, and a $10,000 fine. For the totality of his probation, Appellant was assessed $7,200 in probation fees, $600 in sexual assault program fees, and $95 for drug testing. Seabrook testified that Appellant failed to make his required monthly payments and only submitted three payments toward the total in February, July, and September of 2021.

*Analysis*

*Sufficiency of the Evidence*

In his first issue on appeal, Appellant contends that the evidence was insufficient to support a finding that he intentionally violated the terms and conditions of his community supervision. In four sub-issues, Appellant addresses the findings of his (1) payment violations, (2) curfew violations, (3) failure to submit to drug testing, and (4) discharge from the treatment program and GPS violations.

We review a trial court's decision to revoke community supervision under an abuse-of-discretion standard. *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006); *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984). The State must prove a violation of the terms and conditions of community supervision by a preponderance of the evidence, and proof of any one of the alleged violations is sufficient to uphold the trial court's decision to revoke. *Garcia v. State*, 387 S.W.3d 20, 26 (Tex. Crim. App. 2012) ("proof of a single violation will support revocation"); *Cardona*, 665 S.W.2d at 493 (burden of proof is by a preponderance of the evidence); *Moore v. State*, 605 S.W.2d 924, 926 (Tex. Crim. App. [Panel Op.] 1980) ("one sufficient ground for revocation will support the court's order to revoke probation"); *Jones v. State*, 472 S.W.3d 322, 324 (Tex. App.—Eastland 2015, pet. ref'd). Accordingly, "to prevail on appeal, the defendant must successfully

challenge all of the findings that support the revocation order." *Silber v. State*, 371 S.W.3d 605, 611 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

"[T]he trial judge is the sole judge of the credibility of the witnesses and the weight to be given to their testimony." *Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013) (citing *Davila v. State*, 547 S.W.2d 606, 609 (Tex. Crim. App. 1977)). We review the evidence in the light most favorable to the trial court's ruling. *Cardona*, 665 S.W.2d at 493.

We first address Appellant's assertion that the State failed to prove that he "intentionally or knowingly" committed most of the alleged violations. Generally, unless there is an issue of nonpayment of restitution or other supervisory fees, the State has no duty to prove intentional conduct when the terms of the community supervision do not specify a mens rea. *See Stanfield v. State*, 718 S.W.2d 734, 737–38 (Tex. Crim. App. 1986) (concluding that the State has the burden to prove intentional failure to pay fees and costs); *see Smith v. State*, No. 06-12-00065-CR, 2013 WL 238883, at *3 (Tex. App.—Texarkana Jan. 23, 2013, no pet.) (mem. op., not designated for publication) (noting that, except for nonpayment of fees, the State has no duty to prove intentional conduct where the condition does not specify a mens rea); *Cano v. State*, No. 01-00-01210-CR, 2001 WL 1098023, at *1 (Tex. App.—Houston [1st Dist.] Sept. 20, 2001, no pet.) (not designated for publication) (concluding the State has no duty to prove voluntary or intentional conduct for a failure to report violation). Here, the terms of community supervision that Appellant asserts were not "intentionally" violated do not specify a mens rea standard, and therefore, the State was not required to prove a particular mental state in order to establish a violation of the conditions of community supervision. *See Hardy v. State*, No. 08-21-00076-CR, 2022 WL 1210573, at *2 (Tex. App.—El Paso Apr. 25, 2022, no pet.) (not designated for publication).

As to the curfew violations, Appellant asserts that the State's failure to provide more than a "cursory statement" to support them is not enough to meet the preponderance-of-the-evidence standard. As to his failure to submit to drug testing, Appellant also contends that "cursory statements" are the only evidence to support the violations, and he maintains that he did not receive the notification for the appointment and never "knowingly or intentionally" missed any scheduled tests.

Finally, Appellant asserts that the evidence was insufficient to show that he "intentionally or knowingly" violated the conditions requiring his completion of sex offender treatment program and GPS monitoring. As to his unsuccessful discharge from the treatment program, Appellant contends that his reluctance to admit the underlying sexual conduct and difficulty communicating with the treatment provider are not enough to support that he intentionally or knowingly violated his requirement to complete the program. Appellant also asserts that none of the GPS violations were "intentional acts or conscious decisions on his part," and therefore cannot support Appellant's intentional noncompliance.

Because the community supervision conditions requiring drug testing, a curfew, GPS monitoring, and the sex offender treatment program do not involve a mens rea requirement, the State was not required to prove either an intentional or knowing violation by Appellant in order to support the trial court's revocation decision. *See Stanfield*, 718 S.W.2d at 737–38. The State was only required to prove a violation of these conditions by a preponderance of the evidence. *See Cardona*, 665 S.W.2d at 493. Appellant's contention that cursory evidence of these violations does not meet the preponderance-of-the-evidence standard is incorrect under the standard of review requiring the appellate court to view the evidence in the light most favorable to the trial court's ruling, and the fact that the trial judge is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See Hacker*, 389 S.W.3d at 865; *Cardona*, 665 S.W.2d at 493.

11

As noted previously, only one ground is necessary to support the trial court's revocation of community supervision. *See Garcia*, 387 S.W.3d at 26. We direct our attention on Appellant's failure to comply with his sex offender treatment condition because of the seriousness of the condition with respect to Appellant's underlying conviction. Appellant was ordered to "[p]articipate in and successfully complete the Midland County Sexual Offender Treatment Program . . . [and] [a]bide by all rules and regulations of the program." Appellant's noncompliance with the sex offender treatment program began early in Appellant's community supervision term. Seabrook testified about Appellant's seventy-nine-day delay in completing and returning the intake packet required for enrollment in the program, and Appellant admitted this failure during his testimony but claimed he "couldn't really force [him]self to get through [it]". Seabrook also testified to reports she received regarding Appellant's "flippant attitude" and continued failure to comply with the rules of group therapy, even after his conduct had been addressed.

Brown testified about the poor conduct and noncompliance that Appellant maintained throughout his time in the program. Appellant's refusal to comply with the group's policy of respect was evidenced by Brown's testimony of Appellant's "uninterested, indifferent and distracted" attitude and lack of participation in the peer group. According to Brown, Appellant continually displayed a lack of interest in seriously participating in the program by watching television, using inappropriate screen names, and "huff[ing]" in response to questions. Appellant's noncompliance was so apparent during sessions that other members of his treatment group reached out to Seabrook and Brown to report their suspicions that Appellant violated the group's confidentiality rule.

Brown also spoke about the admissions that Appellant made during the polygraph examination. Brown's testimony that Appellant recanted those admissions and "bragged" about fooling the examiner support the fact that Appellant

12

had not made progress toward the requisite successful completion of the program. Moreover, when questioned by Brown during his last session, Appellant denied making "any progress whatsoever" in the treatment program. Appellant's belief that he was compliant and only attempting to balance "keeping up with probation" and maintaining a healthy mental state does not negate his failure to successfully complete the sex offender treatment program as ordered.

The evidence is sufficient to show that Appellant did not successfully complete the sex offender treatment program as ordered. *See Carroll v. State*, No. 11-10-00326-CR, 2011 WL 4136539, at *2 (Tex. App.—Eastland Sept. 15, 2011, no pet.) (mem. op., not designated for publication) (holding that failure to complete the sex offender treatment program as ordered is sufficient to support the revocation of community supervision). Because the evidence was sufficient to show that Appellant violated at least one of the conditions of his community supervision, the trial court did not abuse its discretion by revoking community supervision based upon this violation. *See Garcia*, 387 S.W.3d at 26.

In connection with his first issue, Appellant asserts that the trial court erred when it ordered him to pay court-appointed attorney's fees in the amount of $5,850. Appellant contends that it was error for the trial court to assess the court-appointed attorney's fees against him because he was found to be indigent at the outset and the record contains no evidence of any material change in his financial circumstances.[3] Appellant presents two basic contentions with respect to the assessment of court-appointed attorney's fees: (1) the payment of court-appointed attorney's fees should not have been made a condition of community supervision, and therefore it could

---

[3]The State agrees with Appellant's contention that he was initially found to be indigent and that the trial court did not subsequently make a determination of a material change in his financial circumstances.

not serve as a basis for revocation; and (2) he should not be ordered to pay court-appointed attorney's fees in the district clerk's bill of costs.[4]

With respect to Appellant's assertion that he should not have been ordered to pay court-appointed attorney's fees as a condition of community supervision and that it, therefore could not serve as a basis for a violation, Appellant has waived his complaint by not challenging that condition of community supervision when the trial court entered it in 2019. *See Riles v. State*, 452 S.W.3d 333, 337 (Tex. Crim. App. 2015) (holding that the defendant procedurally defaulted by failing to raise the attorney-fee issue in a direct appeal from the initial order of deferred adjudication).

The district clerk's bill of costs is a different matter because it was not entered until December 2022, after the entry of the judgment revoking community supervision. An indigent defendant cannot be taxed the cost of services rendered by his court-appointed attorney unless the trial court finds that the defendant has the financial resources to repay those costs in whole or in part. *Smith v. State*, 631 S.W.3d 484, 501 (Tex. App.—Eastland 2021, no pet.) (citing *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010)); *see* TEX. CODE CRIM. PROC. ANN. art. 26.05(g) (West Supp. 2024); *see also* CRIM. PROC. art. 42A.301(b)(10) (repayment of attorney's fees as a condition of community supervision). The Court of Criminal Appeals has held that the trial court must find that the defendant had the ability to repay court-appointed attorney's fees prior to assessing such fees against an indigent defendant. *Cates v. State*, 402 S.W.3d 250, 251–52 (Tex. Crim. App. 2013); *see also Mayer*, 309 S.W.3d at 556 ("[T]he defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees."). Further, a "defendant who is determined by the [trial] court to be indigent is presumed to remain indigent

---

[4]Appellant makes a similar argument with respect to the assessment of court reporter's record fees in the district clerk's bill of costs.

for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs." *Cates*, 402 S.W.3d at 251 (quoting CRIM. PROC. art. 26.04(p)).

Appellant signed a sworn affidavit of indigence certifying that he did not have the necessary funds to hire an attorney to defend against the allegations in the State's motion to revoke. The trial court determined that Appellant was indigent and appointed trial counsel to represent Appellant's interests in the revocation proceedings. Subsequent to this appointment, the trial court did not receive evidence, nor did it issue a finding, that Appellant had the ability to pay any portion of the attorney's fees that were awarded to his court-appointed attorney. Moreover, nothing in the record indicates that (1) Appellant is no longer indigent or (2) the trial court made a subsequent determination that Appellant's financial circumstances had materially changed or that he had the financial resources or ability to pay the court-appointed attorneys fees of $5,850 that were assessed against him for the revocation proceedings. The same principles apply to the assessment of court reporter's fees against an indigent defendant. *See Smith*, 631 S.W.3d at 500–01. Because the district clerk's bill of costs improperly assessed and ordered that Appellant is responsible for the payment of court-appointed attorney's fees and court reporter's record fees, we must modify the district clerk's bill of costs to delete the $5,850 court-appointed attorney's fees and the $2,373 court reporter's record fee. *See Cates*, 402 S.W.3d at 252; *Smith*, 631 S.W.3d at 501.

We overrule Appellant's first issue challenging the sufficiency of the evidence supporting the revocation of his community supervision.

*Hearsay*

In his second issue, Appellant contends that the trial court abused its discretion when it admitted Appellant's GPS monitor records because statements within the records were hearsay and not otherwise admissible. Appellant acknowledges that

the GPS records were admissible under the business record exception, but he maintains that the admitted records contain inadmissible communications between office employees and Appellant's probation officer. *See* Tex. R. Evid. 803(6).

We review a trial court's ruling on admissibility of evidence for an abuse of discretion. *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). We will uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim. App. 2001).

The erroneous admission of evidence generally constitutes a nonconstitutional error and is reviewed under Rule 44.2(b) of the Texas Rules of Appellate Procedure. *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007); *Cordero v. State*, 444 S.W.3d 812, 819 (Tex. App.—Beaumont 2014, pet. ref'd) ("The erroneous admission of hearsay is non-constitutional error that is subject to a harm analysis under rule 44.2(b) of the Texas Rules of Appellate Procedure."). Under Rule 44.2(b), we disregard any nonconstitutional "error, defect, irregularity, or variance that does not affect [the defendant's] substantial rights." Tex. R. App. P. 44.2(b).

We need not decide whether the trial court erred in admitting the GPS records over Appellant's hearsay objection because any such error was harmless under Rule 44.2(b). As we have said, one sufficient ground will support the trial court's order revoking community supervision. *Garcia*, 387 S.W.3d at 26; *Smith v. State*, 286 S.W.3d 333, 342 (Tex. Crim. App. 2009). When the trial court finds multiple violations, we will affirm a revocation order if the State proved any one of them by a preponderance of the evidence. *See Smith*, 286 S.W.3d at 342. Here, the alleged GPS violations were only one of the multiple violations found by the trial court to be "true." Because we have rejected Appellant's evidentiary challenge to his multiple violations, including the failure to complete sex offender treatment

program, Appellant's substantial rights were not affected by the trial court's ruling on Appellant's hearsay objection. We overrule Appellant's second issue.

*Failure to Consider Mitigating Evidence*

In his third issue, Appellant asserts that the trial court abused its discretion in revoking Appellant's community supervision, rather than continuing, modifying, or extending it in light of Appellant's mitigating evidence. Specifically, Appellant contends that:

> The State did not allege and did not prove any new criminal misconduct by [Appellant]; rather, the findings concerned technical violations and miscommunication or communication failures between [Appellant] and his probation officer as well as [Appellant] and his treatment provider. [Appellant] submits that the district court failed to fully consider his mitigation evidence when it declined to continue him on probation.

The mitigation evidence cited by Appellant includes his financial difficulties that caused him to be unable to make the required payments, his severe anxiety and depression, which impacted his ability to be fully compliant, and the evidence that he was at a low risk for reoffending.

We review a trial court's determination of punishment for an abuse of discretion. *Jackson v. State*, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984). The general rule is that a trial court does not abuse its discretion if the sentence is within the proper range of punishment. *Id.* A trial court's decision regarding what sentence to impose is a "normative process, not intrinsically factbound." *Ex parte Chavez*, 213 S.W.3d 320, 323 (Tex. Crim. App. 2006). "Subject only to a very limited, 'exceedingly rare,' and somewhat amorphous Eighth Amendment gross-disproportionality review, a punishment that falls within the legislatively prescribed range, and that is based upon the sentencer's informed normative judgment, is unassailable on appeal." *Id.* at 323–24 (footnote omitted).

"[A] trial court has broad discretion at the conclusion of revocation proceedings to continue, extend, modify, or revoke a defendant on community supervision." *Brooks v. State*, 153 S.W.3d 124, 126 (Tex. App.—Beaumont 2004, no pet.) (citing *Ex parte Tarver*, 725 S.W.2d 195, 200 (Tex. Crim. App. 1986) ("A trial court in a motion to revoke probation hearing has wide discretion to modify, revoke, or continue the probation.")). As explained by the Fourteenth Court of Appeals:

> When "regular" community supervision is revoked, a trial court may proceed to dispose of the case as if there had been no community supervision. In other words, the trial court may impose the sentence originally assessed. Or, if the trial court determines that the best interests of society and the defendant would be served by a shorter term of confinement, the trial court may exercise its discretion to reduce the term of confinement originally assessed to any term not less than the minimum prescribed for the offense. The trial court may not increase the term of confinement beyond the term originally assessed.

*Lombardo v. State*, 524 S.W.3d 808, 816–17 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citations and footnotes omitted). Here, the jury originally assessed a sentence of ten years, and the trial court determined that a three-year term of confinement should be imposed.

To preserve alleged error relating to excessive punishment, a defendant must make a timely request, objection, or motion to the trial court. *Mercado v. State*, 718 S.W.2d 291, 296 (Tex. Crim. App. 1986); *Castaneda v. State*, 135 S.W.3d 719, 723 (Tex. App.—Dallas 2003, no pet.). The record does not reflect that Appellant presented his excessive sentencing complaint to the trial court. Even if Appellant had preserved the error, his contention is without merit. In light of the jury's original punishment recommendation, in sentencing Appellant, the trial court could consider the full range of punishment for a second-degree felony offense—no less than two years but no more than twenty years confinement. PENAL § 12.33(a). The trial court

imposed the three-year sentence of confinement for the offense for which the jury found Appellant guilty—the online solicitation of a minor under fourteen years of age—a sentence which is at the lower end of the punishment range. Further, Appellant's argument on appeal ignores the illegal conduct for which he was convicted.[5] The trial court was certainly permitted to consider the details of Appellant's offending conduct to determine his sentence. *See* CRIM. PROC. art. 42A.755(a)(1) (West 2018) ("If community supervision is revoked after a hearing under Article 42A.751(d), the judge may: (1) proceed to dispose of the case as if there had been no community supervision."). When those details are considered, along with Appellant's lack of compliance with the conditions of his community supervision, the trial court did not abuse its discretion by revoking Appellant's community supervision and sentencing him to confinement for three years. *See id.* art. 42A.755(a)(2). We overrule Appellant's third issue.

*This Court's Ruling*

We modify the district clerk's bill of costs, and as modified, we affirm the judgment of the trial court.


JOHN M. BAILEY
CHIEF JUSTICE


December 19, 2024

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

---

[5]*See supra* note 2.